## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| WILLIAM DAKE,<br>on behalf of Plaintiff and the class<br>members described herein, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| STANLEY CHAO;<br>FIRST LOAN;<br>NP FINANCE, LLC;<br>UNKNOWN ACH PROCESSOR;<br>and JOHN DOES 1-10; | )<br>)<br>)<br>)      DEMAND FOR TRIAL BY JURY<br>) |
| Defendants. | )<br>) |

## COMPLAINT – CLASS ACTION

1.      Plaintiff, William Dake, brings this action against Defendants Stanley Chao ("Chao"), First Loan, NP Finance, LLC ("NP Finance"), Unknown ACH Processor, and John Does 1-10 (collectively, "Defendants") to secure redress for usurious and illegal loans made to Indiana residents.

2.      Plaintiff seeks damages under the Indiana Consumer Credit Code (Count I) and treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count II).

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367. Jurisdiction may also exist under 28 U.S.C. § 1332(d).

4.      This Court has personal jurisdiction over Defendants because they:

        a.      Knowingly participated in the making and collection of unlawful loans to Indiana residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer.

-1-

*Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures,* 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b.    Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

5.    Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Indiana.

6.    Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

7.    Plaintiff William Dake is a natural person who at all times relevant has resided in Indianapolis, Indiana.

### Defendant First Loan

8.    First Loan most recently claimed to be "a Native American-owned business

operated by the Elem Indian Colony of Pomo Indians…" (Exhibit A, p. 3). It used the addresses:

  a.    PO Box 1536, Lower Lake, CA 95457, and

  b.    16170 Main Street, Suite I, Lower Lake, CA 95457.

9.    Previously, First Loan claimed to be owned by the Kashia Band of Pomo Indians of the Stewarts Point Rancheria (the "Kashia Tribe"), an unrelated small Native American tribe which purported to own over twenty internet lenders.

10.    In fact, First Loan was controlled by Defendant Chao, who set all relevant policies.

11.    First Loan, via the website www.firstloan.com, offered loans at annual percentage rates of 700% and higher. (Exhibit A)

12.    As of November 2022, the website, www.firstloan.com, stated that First Loan is no longer taking new applications. (Exhibit B)

13.    First Loan's web server's IP address is 52.43.81.11, which corresponds to a physical location in Oregon, more than 1,000 miles from the Elem Indian Colony of Pomo Indians' ("Elem Tribe") reservation. (Exhibit C)

14.    The same IP address, 52.43.81.11, has been used for other high-interest lenders operated by Chao, including www.cometloans.com (Exhibit D).

15.    On information and belief, thousands of First Loan loans have been made to Indiana residents, including Plaintiff.

16.    These residents have received loan funds via ACH transfers into bank accounts located in Indiana. The loans also provide for repayment via ACH transfers.

17.    First Loan advertises and makes loans to Indiana residents at rates greatly exceeding the maximum permitted under Indiana law.

18.    At the time of the loan at issue, First Loan's website stated that it would not make loans to residents of Arkansas, Connecticut, Florida, Georgia, Maine, Maryland, Massachusetts, Minnesota, New York, North Carolina, Pennsylvania, Vermont, Virginia, and West Virginia. (Exhibit A, p. 3) Illinois was added to the list in 2022 (Exhibit B, p. 5) after an Illinois resident sued

First Loan and Chao for making a usurious loans.

19.     First Loan does not lend to persons in the states listed above because state authorities or private parties in those jurisdictions aggressively enforce usury laws.

20.     First Loan thus affirmatively sought out Indiana residents for such loans at the relevant time.

21.     All loans made by First Loan were made at an annual percentage rate exceeding the maximum which may be charged to an Indiana resident.

### Defendant Chao

22.     Defendant Chao is a natural person who may be found at 10443 Los Feliz Dr., Orlando, FL 32836. Chao also resides at 10060 Hyperion Ln, Orlando, FL 32836-4017

23.     Chao is the beneficial owner of numerous online lending websites. He operates, and is the beneficial owner of, www.firstloan.com.

24.     On information and belief, Chao has near-total control over the First Loan lending business.

25.     At no time has Chao or any of his websites or entities held any type of consumer lending license from the Indiana Department of Financial Institutions.

26.     At no time has Chao or any of his websites or entities held a bank or credit union charter.

27.     Some collections of these loans are conducted under the name of Apex Servicing.

### Defendant Unknown ACH Processor

28.     Defendant Unknown ACH Processor is the person or entity who, at all times relevant, processed the Automated Clearing House ("ACH") payment transactions for First Loan.

29.     Plaintiff believes he can ascertain the identity of Unknown ACH Processor since it uses a unique Prearranged Payment and Deposit Identification number ("PPD ID"), which Plaintiff should uncover in discovery.

-4-

**Defendant NP Finance, LLC**

30.     Defendant NP Finance, LLC is a limited liability company organized under Delaware law with its principal address located at 50 Tice Blvd., Suite 160, Woodcliff Lake, NJ 07677. Its registered agent is Harvard Business Serves, Inc., 16195 Coastal Hwy, Lewes. DE 19958.

31.     On information and belief, NP Finance, LLC provides the capital used to fund the loans made by First Loan.

32.     On information and belief Defendant Chao owns NP Finance, LLC and is its sole member. Defendant Chao previously acted as the registered agent for NP Finance, LLC.

**Defendants John Does 1-10**

33.     Defendants John Does 1-10 are other persons and entities that participated in the lending activities described herein.

**FACTS**

**Defendants' Lending Operations**

34.     Defendant Chao is a businessman who has owned and controlled a number of high-interest online loan websites, including www.firstloan.com and www.rightnowloans.com. Others include www.inboxloan.com and www.cometloans.com, which, like www.firstloan.com, claim to no longer originate loans.

35.     All of these websites purported to be owned and operated by tiny, remote, economically impoverished Native American tribes.

36.     For example, www.cometloans.com was purportedly owned by the Tonto Apache Tribe, a tribe in rural Payson, Arizona, about ninety-five miles northeast of Phoenix. The Tonto Apache Tribe has 110 enrolled members and an 85-acre reservation, the smallest of any Native American reservation in Arizona. Due to its small size, lack of natural resources, and remote location, the Tonto Apache Tribe has struggled economically.

37.     First Loan is purportedly owned and operated by the Elem Tribe.

38.     The Elem Tribe is a group of Pomo Indians based near Clearlake, California.

39.     The Elem Tribe has marginal economic activities due to its small size, remote location, and lack of natural resources.

40.     Despite claims that the Elem Tribe owns First Loan, the true beneficial owners are Chao, his companies, and his non-tribal investors.

41.     Chao, his companies, and his non-tribal investors manage, underwrite, collect, service, and profit from the lending operation.

42.     Chao takes advantage of the Elem Tribe's desperation by offering to pay them modest amounts in exchange for their claiming ownership of his illegal payday lending operations, enabling Chao to assert that the loans are being made by the Elem Tribe itself.

43.     On information and belief, the Elem Tribe receives less than 2% of loan revenues for being the straw owner of the website www.firstloan.com and, more importantly, providing a veil of sovereign immunity.

44.     Such arrangements are commonly referred to as "rent-a-tribe" schemes.

45.     Through such schemes, non-tribal payday lenders such as Chao attempt to avoid the restrictions of state and federal laws which would otherwise prohibit usurious loans. They do this by issuing loans in the name of a Native American tribal business entity that purports to be shielded from state and federal law via tribal sovereign immunity.

46.     In reality, the tribal lending entity is a mere "front" for the illegal lending scheme. All substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the Native American tribe. In exchange for the use of the tribe's name, those operating the payday lending scheme pay the cooperating tribe a fraction of the revenues generated, almost always in the single digits.

47.     First Loan is not an "arm" or economic entity of the Elem Tribe. It, therefore, has no colorable claim, let alone entitlement, to sovereign immunity.

48.     Chao also owns a number of other entities that are related to "tribal" lending,

including:

        a.      ARB Call Facilities, Inc. ("ARB"), which provides call center services for

Chao's payday lenders and other entities, with call centers in Costa Rica, the Philippines, Egypt and

other locations. Chao has held himself out as President of ARB. (Exhibit E, p. 3 of 6)

        b.      Sabre Analysis, LLC, which claims to be a "portfolio servicing company

specializing" in "Data Analytics, Lead Purchase Strategy, Collections Strategies (and) Reporting."

        c.      Apex Servicing, which is either (i) an entity of unknown organization

which collects loans issued by First Loan and other payday lending websites beneficially owned by

Chao, or (ii) a fictitious name under which Chao collects the loans issued by First Loan. Apex

Servicing has a website (https://www.apexservicing.com/), on which it lists addresses of (i) PO Box

637, 333 South Main Street, Blanding, Utah 84511 and (ii) #1 Wakpamni Lake Housing, Batesland,

South Dakota 57716, which is located on the Oglala Sioux Reservation. The premises at 333 South

Main Street, Blanding, Utah 84511 appear to contain a pottery shop called Cedar Mesa Pottery, a

CPA office and a tax preparation office. Apex Servicing claims on its website that it:

> is a Tribal licensed third-party servicer. Apex Servicing is a Native American owned business operated by Wakpamni Lake Community Corporation an Oglala Sioux Tribe of the Pine Ridge Indian Reservation, a federally recognized and sovereign nation located in the United States. Apex Servicing abides by all applicable federal laws and regulations and tribal law as established by the Oglala Sioux Tribe of the Pine Ridge Indian Reservation.

### INVALIDITY OF CLAIM OF TRIBAL IMMUNITY

49.      In an attempt to evade prosecution under usury laws of states like Indiana, online

lenders, such as First Loan, create an elaborate charade claiming their otherwise illegal businesses are

entitled to the sovereign immunity of Native American tribes.

50.      However, an entity must function as a legitimate "arm of the tribe" in order to enjoy

that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*,

629 F.3d 1173, 1183 (10th Cir. 2010).

51.      To determine if a particular entity is entitled to sovereign immunity, the majority of

courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities']

method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

52.    These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, are conducted by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

53.    Where, as here, non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, the business is not in fact "operated" by a Native American tribe and, therefore, are not shielded by sovereign immunity.

54.    Further, sovereign immunity, even if legitimately invoked, does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

55.    Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.,* No. 1:16-cr-00091-PKC (S.D.N.Y.). The conviction was affirmed in *United States v. Grote,* 961 F.3d 105 (2d Cir. 2020).

### Defendants' Loans

56.    First Loan made loans through its website, www.firstloan.com, to consumers at

interest rates in excess of 700% annually. (Exhibit A)

57.     Per First Loan's website, a $500 loan results in repayment of $3,887.82 if paid bi-weekly for a year. The total interest charged would be $3,387.82, which according to First Loan, equates to an annual percentage rate of 777.83%.

58.     The loans were collected under the name of Apex Servicing (Exhibits F-G).

59.     On information and belief, Apex Servicing only services loans issued by Chao's network of online lenders.

60.     More recently, such loans were collected under the name of Valley Servicing.

**Loan to Plaintiff**

61.     On December 6-7, 2021, "First Loan" made a $1500 loan to Plaintiff William Dake. Plaintiff does not have his loan agreement, but does have notice of approval (Exhibit H), and the annual percentage rate on all First Loan loans exceeded 700%. Exhibit I illustrates the form of loan agreement used by First Loan.

62.     The loan agreement is a standard form.

63.     Plaintiff's loan was made for personal purposes and not for business purposes.

64.     The principal amount was transferred to Plaintiff's bank account in Indiana via ACH.

65.     The loan was made entirely via Internet.

66.     Unknown ACH Processor processed the transaction.

67.     The loan was to be repaid via ACH.

68.     Plaintiff made payments on the loan, including interest.

69.     First Loan's lending does not actually occur on the Elem Tribe's reservation.

70.     A significant majority of the transaction occurs within the State of Indiana – applying for the loan and receiving and collecting the funds.

71.     The place where a consumer is located when he or she submits an application via an online portal with a Native American tribe determines where the transaction takes place for

jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

72.     Plaintiff has never set foot on the Elem Tribe's land in California.

73.     Loans to Indiana residents made in the same manner as the loan to Plaintiff are governed by the laws of the State of Indiana.

74.     Defendant Chao is responsible for orchestrating the lending scheme pursuant to which First Loan lent money to Plaintiff and other Indiana residents.

75.     Unknown ACH Processor was paid for its role in processing ACH payments relating to the loans.

76.     NP Finance was paid for its role in funding loans made by First Loan.

77.     On June 23, 2022, Plaintiff was advised that his loan had been transferred to Valley Servicing, www.valleyservicing.com. (Exhibit I)

## Indiana Regulation of Lending

78.     The Indiana Uniform Consumer Credit Code establishes a maximum loan finance charge of 36% per annum for consumer loans.

79.     Ind. Code § 24-4.5-3-201, dealing with loans other than supervised loans, provides:

(1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

80.     With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

Loan finance charge for supervised loans.

(1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.

-10-

(2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:

> (a) the total of:

>> (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;

>> (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

>> (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or

> (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

81.     There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq.*, but it does not authorize Defendants' rates, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

82.     The finance charge First Loan imposes greatly exceeds that permitted in Indiana on either unsupervised or supervised loans.

83.     Ind. Code § 24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

> (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.

> (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

> (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a

resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

(f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

(a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

(a) An agreement that the law of another state shall apply.

(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

(c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

84.    Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . .(3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and **if the debtor has paid an excess charge the debtor has a right to a refund**. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

-12-

(4) ***If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.*** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award ***reasonable attorney's fees*** incurred by the debtor. . . .   (Emphasis added)

85.     Defendants' violation of Indiana law was intentional. In 2019, Defendants were warned by the State of Washington that they were violating state usury laws. (Exhibits K-L)

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

86.     Plaintiff incorporates paragraphs 1-85.

87.     Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff is entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

88.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

89.     The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "First Loan" at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

90.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

91.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

92.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

93.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

94.    Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

95.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.    Individual actions are not economically feasible.

b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i.    Damages as provided by statute;

ii.    Attorney's fees, expenses and costs; and

iii.    Such other or further relief as is appropriate.

## COUNT II – RICO

96.    Plaintiff incorporates paragraphs 1-85.

97.    This claim is against Chao, who is the RICO "person."

98.    All loans made in the name of "First Loan" to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

-14-

99.     The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

100.     "First Loan" is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

101.     Defendant Chao is associated with this enterprise.

102.     Defendant Chao conducted or participated in the conduct of the affairs of "First Loan" through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

103.     Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

104.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

105.     The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "First Loan" at more than 72% interest (all of its loans qualify) (c) which loan was made on or after a date four years prior to the filing of suit.

106.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

107.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a.     Whether the loans at issue are "unlawful debts" as defined in RICO.

b.     Whether "First Loan" is an "enterprise."

c.     Whether Defendant Chao is associated with "First Loan."

d.     Whether Defendant Chao conducted or participated in the affairs of "First Loan" through a pattern of making and collecting unlawful loans.

108.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained

counsel experienced in class actions and consumer credit litigation.

       109.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

       110.     A class action is superior for the fair and efficient adjudication of this matter, in that:

       a.     Individual actions are not economically feasible.

       b.     Members of the class are likely to be unaware of their rights.

       WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

       i.     Treble damages;

       ii.     Attorney's fees, litigation expenses and costs of suit; and

       iii.     Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## JURY DEMAND

Plaintiff demands trial by jury.


/s/ *Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## <u>LIST OF EXHIBITS</u>

A       First Loan website, first version

B       First Loan website, second version

C       First Loan's IP Address Server Location

D       Comet Loans IP Address Server Location

E       Announcement of Chao presentation at 2017 Native American Financial Association
        meeting

F       Attempt to enforce First Loan wage assignment

G       Attempt to enforce First Loan wage assignment

H       Email to Plaintiff regarding loan approval

I       Email to Plaintiff advising that his loan had been placed with Valley Servicing

J       Form of loan agreement used by First Loan

K       Washington Department of Financial Institutions notice

L       Washington Department of Financial Institutions notice

## NOTICE OF ASSIGNMENT

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
**EDELMAN COMBS LATTURNER**
        **& GOODWIN, LLC**
20 S. Clark St., Suite 1500
Chicago, IL 60603
(312) 739-4200
(312) 739-0379 (FAX)

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman